1
2
3
4
5

MICHAEL J. HADDAD (State Bar #189114)
JULIA SHERWIN (State Bar #189268)
TERESA ALLEN (State Bar #264865)
HADDAD & SHERWIN LLP
505 17th Street
Oakland, CA 94612
T: (510) 452-5500
F: (510) 452-5510
Attorneys for all Plaintiffs

6
7

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

8
9
10
11
12
13
14

JUAN GARCIA, Deceased, through his Co-
Successors in Interest, A.G. and E.G., minors,
through their mother and Next Friend, EVA
LOPEZ HERNANDEZ, and EDUARDO
DANIEL LOPEZ RAMIREZ, Individually
and as Co-Successors in Interest for JUAN
GARCIA, Deceased; EVA LOPEZ
HERNANDEZ, Individually; MARIA DEL
CARMEN BAZAN MARTINEZ,
Individually; and JOSE GARCIA FLORES,
Individually,

15
16

             Plaintiffs,

vs.

17
18
19
20

COUNTY OF NAPA, a public entity; NAPA
COUNTY SHERIFF'S SERGEANT DAVID
ACKMAN, individually; and DOES 1 through
10, individually, jointly and severally,

             Defendants.

Case No. 4:21-cv-03519-HSG

**PLAINTIFFS' RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PORTIONS OF
FIRST AMENDED COMPLAINT [FRCP
12(b)(6)]**

Date:    January 6, 2022
Time:    2:00 p.m.
Dept:    Ctrm. 2, 4th Floor (Oakland)
Judge:   Hon. Haywood S. Gilliam, Jr.

Complaint Filed: May 11, 2021
Trial Date: Not yet assigned

21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.     **INTRODUCTION**................................................................................1

II.    **STATEMENT OF FACTS**..................................................................1

III.   **LEGAL STANDARD** .........................................................................4

IV.   **ARGUMENT** .......................................................................................5

     **A.**     **Plaintiff Eva Lopez Has Standing for Her Familial Association Claim** .......................5

     **B.**     **Plaintiff Eduardo Lopez Has Standing** ...................................................8

          1.     Standing to Bring Wrongful Death and Survival Claims .......................................8

          2.     Standing to Bring Loss of Familial Association Claims...........................11

     **C.**     **Plaintiffs Have Alleged Sufficient Facts to Support a *Monell* Claim** .........................13

          1.     Official Policies/Customs. .........................................................15

          2.     Failures/Omissions Establishing Deliberate Indifference........................17

          3.     Ratification............................................................................18

     **D.**     **Defendants Have Not Met Their Burden to Support Bifurcation, Which Is Unnecessary and Would Increase the Parties' Costs and Work**................................................................19

V.    **CONCLUSION** .................................................................................23

# **TABLE OF AUTHORITIES**

## **Cases**

*A.E. ex rel. Hernandez v. Cnty. of Tulare*,
    666 F.3d 631 (9th Cir. 2012) ....................................................13

*A.G. v. County of Los Angeles*,
    28 Cal.App.5th 373 (2018) .........................................7, 8, 9, 10, 12

*Atayde v. Napa State Hospital*,
    255 F.Supp.3d 978 (E.D. Cal. 2017)...................................14, 19

*Bass v. City of Fremont*,
    No. C12-4943 TEH,
    2013 U.S. Dist. LEXIS 32590 (N.D. Cal. Mar. 8, 2013).................14

*Bates v. UPS*,
    204 F.R.D. 440 (N.D. Cal. 2001)..........................................20

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007)...................................................4, 13

*Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
    481 U.S. 537 (1987).........................................................5

*Burton v. Mountain W. Farm Bureau Mut. Ins. Co.*,
    214 F.R.D. 598 (D. Mont. 2003)...........................................20

*Buscemi v. Pepsico, Inc.*,
    736 F. Supp. 1267, 1271 (S.D.N.Y. 1990)...............................20

*Christie v. Iopa*,
    176 F.3d 1231 (9th Cir. 1999) ...........................................18

*City of Canton v. Harris*,
    489 U.S. 378 (1989)..................................................17, 18

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988).......................................................18

*Clouthier v. Cnty. Of Contra Costa*,
    591 F.3d 1232 (9th Cir. 2010) .....................................15, 17, 18

*Cook v. City of Fairfield*,
    No. 2:15-cv-02339-KJM-KJN
    2017 U.S. Dist. LEXIS 158010 (E.D. Cal. Sept. 26, 2017)...............14

*Cormier v. All Am. Asphalt*,
    458 Fed. Appx. 620 (9th Cir. 2011)................................................................4

*Davis v. Mason Cnty.*,
    927 F.2d 1473 (9th Cir. 1991) .....................................................................21

*De Anda v. City of Long Beach*,
    7 F.3d 1418 (9th Cir. 1993) .........................................................................22

*Dillenbeck v. City of L.A.*,
    69 Cal. 2d 472 (1968) ..................................................................................22

*Dorger v. City of Napa*,
    No. 12-cv-440-YGR,
    2012 U.S. Dist. LEXIS 124551 (N.D. Cal. Aug. 31, 2012).........................14

*Drummond v. City of Anaheim*,
    343 F.3d 1052 (9th Cir. 2003) .....................................................................21

*Duenez v. City of Manteca*,
    No. CIV. S-11-1820 LKK/KJN
    2012 U.S. Dist. LEXIS 23267 (E.D. Cal. Feb. 22, 2012) ...........................14

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) .......................................................................5

*Espinosa v. City and County of San Francisco*,
    598 F.3d 528 (9th Cir. 2010) .........................................................................2

*Estate of Burden*,
    146 Cal.App.4th 1021 (2007) .........................................................................8

*Estate of Mendoza-Saravia v. Fresno County Sheriff's Dep't*,
    No. 1-10-cv-0618 OWW SMS
    2011 U.S. Dist. LEXIS 19697 (E.D. Cal. Feb. 17, 2011)..............................6

*Fitbit, Inc. v. Aliphcom*,
    No. 5:15-cv-04073-EJD
    2016 U.S. Dist. LEXIS 69993 (N.D. Cal. May 27, 2016) ...........................20

*Garlick v. Cnty. of Kern*,
    167 F.Supp.3d 1117 (E.D. Cal. 2016).........................................................6, 7

*Gillette v. Delmore*,
    979 F.2d 1342 (9th Cir. 1992) .....................................................................18

*Griffith v. Allstate Ins. Co.*,
    90 F. Supp. 3d 344 (M.D. Pa. 2014)............................................................20

*Groh v. Ramirez*,
   540 U.S. 551 (2004) ..................................................................................21

*Grudt v. City of L.A.*,
   2 Cal. 3d 575, 588 (1970) .........................................................................22

*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ...................................................................20

*Headwaters Forest Def. v. Cnty. of Humboldt ("Headwaters II")*,
   276 F.3d 1125 (9th Cir. 2002) .................................................................21

*Heldt v. Tata Consultancy Servs.*,
   132 F.Supp.3d 1185 (N.D. Cal. 2015) ........................................................4

*Huizar v. City of Anaheim*,
   840 F.3d 592 (9th Cir. 2016) ...................................................................21

*Hunter v. City & Cnty. of S.F.*,
   No. 11-4911 JSC
   2012 U.S. Dist. LEXIS 146492 (N.D. Cal. Oct. 10, 2012)........................22

*Hunter v. Cnty. of Sacramento*,
   652 F.3d 1225 (9th Cir. 2011) .................................................................22

*IDC v. City of Vallejo*,
   No. 2:13-cv-1987 DAD,
   2014 U.S. Dist. LEXIS 78487 (E.D. Cal. June 6, 2014)....................14, 16

*IDK, Inc. v. Clark Cty.*,
   836 F.2d 1185 (9th Cir. 1988) .................................................................5, 6

*Johnson v. City of Shelby*,
   574 U.S. 10 (2014).............................................................................4, 5, 13

*Johnson v. Shasta Cnty.*,
   83 F.Supp.3d 918 (E.D. Cal. 2015).............................................4, 14, 16, 17

*Kelson v. City of Springfield*,
   767 F.2d 651 (9th Cir. 1985) ...................................................................11

*L.V.B. v. City of Chino*,
   No. EDCV 09-02223 DMG (DTBx)
   2010 U.S. Dist. LEXIS 161316 (C.D. Cal. Feb. 18 2010)...........................6

*Larez v. City of Los Angeles*,
   946 F.2d 630 (9th Cir. 1991) ...................................................................18

*Lee v. City of Los Angeles*,
    259 F.3d 668 (9th Cir. 2001) .......................................................................5, 11

*Lee v. City of Sacramento*,
    No. 2:17-cv-00118-JAM-EFB
    2017 U.S. Dist. LEXIS 122836 (E.D. Cal. Aug. 3, 2017) ...........................4

*Long v. Cnty. of Los Angeles*
    442 F.3d 1178 (9th Cir. 2006) .......................................................................17

*Lopez v. Cnty. of Tulare*,
    No. CV-F-11-1547-LJO-BAM,
    2012 U.S. Dist. LEXIS 1833 (E.D. Cal. Jan. 6, 2012)..........................14, 16

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) .......................................................................5

*Lugtu v. California Highway Patrol*,
    26 Cal. 4th 703 (2001) ...................................................................................22

*Mann v. Sacramento Police Dep't. ("Mann II")*,
    748 Fed. Appx. 112 (9th Cir. 2018) ..............................................................6

*Mann v. Sacramento Police Dep't. ("Mann III")*,
    803 Fed. Appx. 142 (9th Cir. 2020) ..............................................................6

*Martinez v. City of Pittsburg*,
    No. 17-cv-04246-RS
    2019 U.S. Dist. LEXIS 37904, 2019 WL 1102375 (N.D. Cal. Mar. 8, 2019) ..............................17

*Martinez v. Robinson*,
    No. 99 Civ. 11911 (DAB) (JCF)
    2002 U.S. Dist. LEXIS 4454 (S.D.N.Y. Mar. 19, 2002) .............................20

*M.H. v County of Alameda*,
    90 F. Supp. 3d 889 (N.D. Cal. 2013) ......................................................14, 16

*Miller v. Am. Bonding Co.*,
    257 U.S. 304 (1921).......................................................................................20

*Monaghan v. SZS 33 Assocs., L.P.*,
    827 F. Supp. 233 (S.D.N.Y. 1993) ...............................................................20

*Monell v. Dept. of Soc. Servs.*,
    436 U.S. 658 (1978).................................................................................13, 15

*Montantes v. Inventure Foods*,
No. CV-14-1128-MWF (RZx)
2014 U.S. Dist. LEXIS 95266 (C.D. Cal. July 2, 2014) ................................................ 4

*Moore v. City of Vallejo*,
73 F. Supp. 3d 1253 (E.D. Cal. 2014) ................................................ 14, 16

*Neuroth v. Mendocino Cnty.*,
No. 15-cv-03226-NJV,
2016 U.S. Dist. LEXIS 11109 (N.D. Cal. Jan. 28, 2016) ................................................ 14, 19

*Nunes v. Cty. of Stanislaus*,
No. 1:17-cv-00633-DAD-SAB
2017 U.S. Dist. LEXIS 137231 (E.D. Cal. Aug. 25, 2017) ................................................ 14

*Oviatt v. Pearce*,
954 F.2d 1470 (9th Cir. 1991) ................................................ 17

*Price v. Sery*,
513 F.3d 962 (9th Cir. 2008) ................................................ 15

*Quiroz v. Short*,
85 F. Supp. 3d 1092 (N.D. Cal. 2015) ................................................ 5

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984) ................................................ 6, 13

*Robertson v. Wegman*,
436 U.S. 584 (1978) ................................................ 7, 8

*Santosky v. Kramer*,
455 U.S. 745 (1982) ................................................ 11

*Scalia v. Cty. of Kern*,
308 F.Supp.3d 1064 (E.D. Cal. 2018) ................................................ 14

*Shelley v. Cnty. of San Joaquin*,
954 F. Supp. 2d 999 (E.D. Cal. 2013) ................................................ 13

*Skilstaf, Inc. v. CVS Caremark Corp.*,
669 F.3d 1005 (9th Cir. 2012) ................................................ 4

*Smith v. City of Fontana*,
818 F.2d 1411 (9th Cir. 1987) ................................................ 11

*Smith v. Organization of Foster Families for Equality and Reform*,
431 U.S. 816 (1977) ................................................ 11

*Spectra-Physics Lasers, Inc. v. Uniphase Corp.*,
   144 F.R.D. 99 (N.D. Cal. 1992) ................................................................20

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) .............................................................4, 13

*Swierkiewicz v. Sorema, N.A.*,
   534 U.S. 506 (2002) ................................................................................4

*Terry v. City of Pasadena*,
   No. CV 18-07730 SJO (RAOx)
   2019 U.S. Dist. LEXIS 167098 (C.D. Cal. June 17, 2019) ...............10, 11, 12

*Toler v. Gov't Emps. Ins. Co.*,
   309 F.R.D. 223 (S.D.W.Va. 2015)............................................................20

*Vasquez v. Los Angeles Cnty.*,
   487 F.3d 1246 (9th Cir. 2007) ...................................................................4

*Watkins v. City of Oakland*,
   145 F.3d 1087 (9th Cir. 1998) .................................................................18

*Williams v. County of Alameda*,
   26 F.Supp.3d 925 (N.D. Cal. 2014) .........................................................14

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)................................................................................11

*Wise v. Nordell*,
   No. 12-CV-1209 IEG (BGS),
   2012 U.S. Dist. LEXIS 128656 (S.D. Cal. Sept. 10, 2012) .........................15

*Young v. Cnty. of Los Angeles*,
   655 F.3d 1156 (9th Cir. 2011) .................................................................21

*Zivkovic v. S. Cal. Edison Co.*,
   302 F.3d 1080 (9th Cir. 2002) .................................................................20

**Statutes**

42 U.S.C. § 1983 .........................................................................8, 11, 17

42 U.S.C. § 1988 .....................................................................................8

Cal. Code Civ. Pro. §§ 377.10 ...................................................................8

Cal. Code Civ. Pro. § 377.31 .....................................................................9

Cal. Code Civ. Pro. §§ 377.60 ...................................................................................................8

Cal. Fam. Code, § 7601(a) .........................................................................................................8

Cal. Fam. Code, § 7611(d) .....................................................................................................8, 9

Cal. Gov. Code § 820(a) ...........................................................................................................22

Cal. Prob. Code, § 6450(a) .....................................................................................................8, 9

Cal. Prob. Code, § 6453(a) .........................................................................................................8

Cal. Prob. Code § 7000 ..............................................................................................................9

### Rules

Fed. R. Civ. P. 12(b)(6) ...............................................................................................................4

Fed. R. Civ. P. 42(b) .................................................................................................................20

### Other Authorities

Ninth Circuit Manual of Model Jury Instructions Civil § 9.8 (2017) .......................................17

## I.   INTRODUCTION

This is a civil rights, wrongful death, and survival action arising from Defendants' wrongful shooting, use of excessive force, wrongful arrest, and other misconduct resulting in the death of Juan Garcia.  On October 5, 2020, Defendant Napa County Sheriff's Sergeant David Ackman shot Juan Garcia six times in rapid succession during a routine traffic stop.  Juan Garcia was unarmed and posed no threat to Defendant Ackman or others.  Juan Garcia was removed from life support and pronounced dead the following night.

Juan Garcia's longtime partner, his three children, his mother, and his father have brought this civil rights lawsuit against Defendants County of Napa ("County") through the Napa County Sheriff's Office ("NCSO"), Napa County Sheriff's Sergeant David Ackman, and Doe Defendants 1-10.  Defendants move to dismiss Plaintiffs Eduardo Lopez and Eva Lopez for lack of standing.  Defendants also move to dismiss Plaintiffs' second count for municipal liability under 42 U.S.C. § 1983 for failure to state a claim.  Alternatively, Defendants seek to bifurcate the trial and discovery of the individual liability claims and the *Monell* claims, without identifying what issues and discovery they contend are solely *Monell*-related, without identifying any unfair prejudice, and without any argument whatsoever.  Defendants' motion should be denied in its entirety.

## II.   STATEMENT OF FACTS

On October 5, 2020, Juan Garcia became lost as he was driving home from visiting friends who were evacuating from wildfires and staying at the Meritage Resort in Napa, CA.  (Doc. 18, ¶ 22).[1]  At around 10:11 p.m., Defendant Ackman pulled Juan Garcia's vehicle over on Kaiser Road near State Highway 221 in the County of Napa, allegedly for driving without his headlights on.  *Id*.  Roughly 38 seconds later, Defendant Ackman shot Juan Garcia six times, killing him.  *Id*.  At all relevant times, Juan Garcia was unarmed and posed no threat to Defendant Ackman.  *Id*.

Despite Plaintiffs' multiple requests for records—and while Defendants did allow Plaintiffs' counsel and the public to view (via Defendants' press conference and social media posts) some of the body camera video capturing this incident and to be informed of the shooter's identity—Defendants have not provided Plaintiffs or their representatives with any police reports, records of any investigation,

---

[1] Further paragraph references are to the First Amended Complaint ("FAC" Doc. 18).

Coroner's records, autopsy reports, dash cam footage, or other audio or video recordings of this incident beyond what was shown at Defendants' press conference. Defendants apparently have instructed private citizens possibly possessing surveillance video of the incident not to cooperate with Plaintiffs' counsel's requests for access to such footage. (See ¶¶ 17-18).

Bodycam footage of the incident released by the Napa County Sheriff's Office ("NCSO") shows that Defendant Ackman exited his vehicle with his gun drawn and immediately pointed at Juan Garcia. (¶ 22). From the video, there is no apparent justification for this use of a high level of force.[2] *Id.* Juan Garcia then exited his vehicle with his hands empty, as Defendant Ackman clearly could see because both Juan Garcia and his vehicle were well illuminated by the headlights of Defendant Ackman's patrol car. *Id*. Defendant Ackman ordered Juan Garcia to "turn around," which Juan Garcia began doing within seconds, turning and putting his hands behind his back as though he would be handcuffed. *Id*. Defendant Ackman did not tell Juan Garcia to show his hands, or to get on the ground or on his knees. *Id*. On the bodycam video, Juan Garcia appeared confused about what Defendant Ackman expected him to do. *Id*. Based on Juan Garcia's confused demeanor and Defendant Ackman's experience, Defendant Ackman would have understood that Juan Garcia may have diminished capacity due to intoxication, a mental health issue, or a medical issue. *Id*. Despite this, Defendant Ackman failed to communicate appropriately to help orient Juan Garcia and direct the desired compliance. *Id*.

Defendant Ackman then went behind his patrol car to the passenger side and walked up toward Juan Garcia. (¶ 23). With one hand still behind his back, Juan Garcia began to walk toward Defendant Ackman. *Id*. Defendant Ackman was still pointing a gun at Juan Garcia and shining a light on him. *Id*. Juan Garcia still had nothing in his hands and had had no opportunity since exiting his car to arm himself out of Defendant Ackman's sight. *Id*. As Juan Garcia walked toward Defendant Ackman, the only word Defendant ACKMAN said to him was "stop," which he said three times within four seconds. *Id*. Immediately after saying "stop" for the third time, Defendant Ackman shot Juan Garcia, unarmed and unthreatening, six times without pause. *Id*. Defendant Ackman failed to warn Juan Garcia before using

---

[2] *Espinosa v. City and County of San Francisco,* 598 F.3d 528, 537 (9th Cir. 2010), *cert denied*, 132 S. Ct. 1089 (2012) ("pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force").

deadly force, even though a warning was feasible and required under the circumstances. *Id*. Juan Garcia was thereafter taken to the hospital, where he arrived unresponsive. (¶ 24). After undergoing surgeries, Juan Garcia was declared brain dead, and doctors advised Plaintiff Eva Lopez that he should be removed from life support. *Id*. Juan Garcia was pronounced dead at 8:35 p.m. on October 6, 2020. *Id*.

At all times, Juan Garcia had no weapon in his possession and posed no significant or immediate threat of death or serious bodily injury to Defendant Ackman or others. (¶ 25). On information and belief, he made no statements or gestures to justify the use of deadly force and never assaulted or attempted to assault Defendant Ackman. *Id*. Defendant Ackman had feasible alternatives to deadly force, including moving tactically to mitigate any misperceived threat from Juan Garcia and communicating with Juan Garcia to show his hands and warn him that deadly force would be used. (¶ 27). Instead, Defendant Ackman failed to communicate with Juan Garcia and placed himself in a zone of potential danger in violation of his training and generally accepted law enforcement standards. *Id*. Once Defendant Ackman decided to use deadly force, he excessively and unreasonably fired six shots at Juan Garcia without ever pausing between shots to evaluate the need for further deadly force. (¶ 26). Indeed, Juan Garcia was bent over deeply at the waist after the first shot. *Id*. And after the second shot, both of Juan Garcia's hands were in front of his body and obviously empty as he began to go to the ground, which was visible to Defendant Ackman. *Id*. Defendant Ackman nonetheless fired four more shots as Juan Garcia was falling to the ground, unarmed and posing no threat whatsoever. *Id*.

These particular ways in which Defendant Ackman used excessive deadly force – using deadly force for less than an immediate threat, and prematurely as a 'first resort,' and without giving a proper warning, and by firing additional unnecessary gunshots after any claimed threat had been neutralized – were caused by the NCSO's policies, customs, and lack of proper training programs on those very topics. (¶ 39(a)-(d), 40). Further, the NCSO failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendant Ackman and other NCSO personnel, with deliberate indifference to Plaintiffs' constitutional rights. (¶ 41). Policy-makers within the NCSO ratified and approved the conduct of Defendant Ackman, with full knowledge after investigation of his misconduct herein. (¶ 42). And, on information and belief, NCSO policy-makers were aware that other NCSO deputies had engaged in similar misconduct to Defendant Ackman, but failed to discipline such misconduct or to institute and

1  enforce lawful and proper procedures and policies within the NCSO.  (¶ 43).  These policies and practices

2  were the moving force behind Defendant Ackman's violations of Plaintiffs' rights.  (¶ 44).

3  ### III.  LEGAL STANDARD

4  A complaint must satisfy the general notice pleading requirements of Federal Rule of Civil

5  Procedure 8, which requires only "a short and plain statement of the claim showing that the pleader is

6  entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This rule reflects a simplified and lenient pleading system that

7  "was adopted to focus litigation on the merits of a claim" rather than on technicalities that could keep

8  litigants out of court.  *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 513–14 (2002).  In *Bell Atlantic v.*

9  *Twombly*, the Court held that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

10  detailed factual allegations."  550 U.S. 544, 555 (2007).  The factual allegations must only "be enough to

11  raise a right to relief above the speculative level."  *Id.* (citations omitted).  The claims must be "plausible,"

12  which "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence"

13  supporting the allegations.  *Id.* at 556.[3]

14  A district court reviewing a complaint under Rule 12(b)(6) must "construe the complaint in a light

15  most favorable to the non-moving party," *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1249 (9th Cir.

16  2007), and it "'must consider the complaint in its entirety[.]'"  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669

17  F.3d 1005, 1016 n.9 (9th Cir. 2012) (citations omitted).  When allegations may yield multiple inferences,

18  the court must adopt whichever plausible inference supports the Plaintiff and deny the motion to dismiss.

19  *Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011).  Pleading facts "'on information and belief' is

20  sufficient to survive a motion to dismiss as long as the other *Iqbal-Twombly* factors are satisfied."

21  *Johnson v. Shasta Cnty.*, 83 F.Supp.3d 918, 926 (E.D. Cal. 2015) (citations omitted).

22  There is no heightened pleading standard for *Monell* claims, and plaintiffs in civil rights cases

23  need only plead the factual basis for their claims "simply, concisely, and directly."  *Johnson v. City of*

---

24  [3] Even after *Iqbal* and *Twombly*, *Swierkiewicz* remains good law.  *See Bell Atlantic v. Twombly*, 550 U.S.

25  544, 569-70 (2007) (explaining that the Court's analysis does not run counter to *Swierkiewicz*); *See also Starr v. Baca*, 652 F.3d 1202, 1213-16 (9th Cir. 2011) (reconciling *Swierkiewicz* with *Iqbal* and

26  *Twombly*); *Heldt v. Tata Consultancy Servs.*, 132 F.Supp.3d 1185, FN4 (N.D. Cal. 2015) (acknowledging that *Swierkiewicz* is still good law); *Montantes v. Inventure Foods*, 2014 U.S. Dist. LEXIS 95266 at *15

27  (C.D. Cal. July 2, 2014) (same); *Lee v. City of Sacramento*, 2017 U.S. Dist. LEXIS 122836 at *6 (E.D. Cal. Aug. 3, 2017) (same); *Cormier v. All Am. Asphalt*, 458 Fed. Appx. 620 (9th Cir. 2011) (same).

28

*Shelby*, 574 U.S. 10, 11 (2014).

Finally, leave to amend shall by freely given when justice so requires.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  "This policy is to be applied with extreme liberality."  *Id.* (citations omitted).  Unless an amendment would be futile, a district court should freely grant a plaintiff leave to amend the complaint.  Fed. R. Civ. P. 15(a)(2); *see also Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).

## IV.   ARGUMENT

### A.  Plaintiff Eva Lopez Has Standing for Her Familial Association Claim

Juan Garcia's partner and *de facto* wife, Eva Lopez, who lived together with Juan and their children as a family, brings individual claims only based her loss of familial association with Juan under the First and Fourteenth Amendments.  (¶¶ 4, 7, 33).

"[T]he First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'"  *Lee v. City of Los Angeles*, 259 F.3d 668, 685 (9th Cir. 2001) (citing  *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987)).  Beyond recognized family relationships, the First Amendment protects "certain kinds of highly personal relationships." *Roberts v. United States Jaycees*, 468 U.S. 609, 619-20 (1984).  "The protection is not restricted to relationships among family members."  *Quiroz v. Short*, 85 F. Supp. 3d 1092, 1108 (N.D. Cal. 2015) (citing *Board of Dirs. of Rotary Int'l*, 481 U.S. at 545.  Similarly, "[t]he relationships protected by the Fourteenth Amendment are those that attend the creation and sustenance of a family and similar highly personal relationships." *IDK, Inc. v. Clark Cty.*, 836 F.2d 1185, 1193 (9th Cir. 1988) (quoting *Roberts*, 468 U.S. at 618-19).

Family relationships are protected from wrongful government interference by both the First and Fourteenth Amendments.  *Roberts*, 468 U.S. at 617-18.

> Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation,

and seclusion from others in critical aspects of the relationship.  As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty.

*Roberts*, 468 U.S. at 619-620.

Applying these principals, courts in the Ninth Circuit have recognized that the Constitutional right to familial association extends to some unmarried couples.  In *Garlick v. Cnty. of Kern*, the plaintiff provided evidence that she and the decedent "were a romantic couple and intimate partners, lived together for years, [had] four young children, celebrated family birthdays, took the children to appointments, went on walks to the park and grocery store, and that they made significant life decisions to remain living together through difficult circumstances."  167 F.Supp.3d 1117, 1165 (E.D. Cal. 2016).  The Court concluded that "[t]his kind of cohabitating partnered relationship is the kind of tie that 'ha[s] played a critical role in the culture and traditions of the nation by cultivating and transmitting shared ideals and beliefs."  *Id*. (quoting *IDK*, 836 F.2d at 1193 (quoting *Roberts*, 468 U.S. at 618-19)).  *See also Estate of Mendoza-Saravia v. Fresno County Sheriff's Dep't*, 2011 U.S. Dist. LEXIS 19697, *6 (E.D. Cal. Feb. 17, 2011) ("the Complaint's allegations of an intimate domestic association, albeit unmarried, where decedent's family was combined with Plaintiff; they lived together; she was pregnant with decedent's child at the time of his death; they shared finances; and co-habited and shared the intimate details of each other's lives; all converge to satisfy the intimate association familial relationship requirement of the Fourteenth Amendment."); *L.V.B. v. City of Chino*, 2010 U.S. Dist. LEXIS 161316, *17-19 (C.D. Cal. Feb. 18 2010) (finding that "[plaintiff's and decedent's] relationship was, in all but nominal respects, indistinguishable from a marriage" and remarking, "[t]he Court can discern no principled reason under Ninth Circuit precedent for basing the availability of substantive due process law on a legal formality.").

The Ninth Circuit has held that even siblings may have First Amendment claims for loss of familial association where their relationship included cohabitation or other indicia of intimacy.  See *Mann v. Sacramento Police Dep't. ("Mann II")*, 748 Fed. Appx. 112, 114-15 (9th Cir. 2018), *modified in part by Mann v. Sacramento Police Dep't. ("Mann III")*, 803 Fed. Appx. 142, 143-144 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 622 (2020).

Here, facts from Plaintiffs' FAC support that Plaintiff Eva Lopez and Decedent Juan Garcia were in a committed, intimate relationship worthy of Constitutional protection.  Ms. Lopez "is the longtime

partner and de facto wife of Decedent, Juan Garcia[,]" and Mr. Garcia was "a loving companion to his longtime life-partner, [Ms. Lopez]." (¶¶ 4-5, 7, 21). They lived together as a family with their three children, A.G., E.G., and Eduardo Lopez for over 20 years. *Id.* Within their relationship, Mr. Garcia accepted and treated Ms. Lopez's son, Eduardo, as his own son since Eduardo, now 24 years old, was three years old. (¶ 5). Four years later, when they had their first son, A.G., together, Mr. Garcia and Ms. Lopez "were so happy to give [Eduardo], then seven years old, a sibling, and to teach him the importance of taking care of and looking out for his siblings." (¶ 21). In raising their family together, Ms. Lopez coordinated her work schedule with Mr. Garcia's "so that one of them would always be home with the kids." *Id.* "[O]n a memorable family trip to the snow" nine years after A.G. was born, Mr. Garcia and Ms. Lopez discussed having another child together—and the following August, E.G. was born. *Id.* The day before Mr. Garcia was shot and killed, he and Ms. Lopez threw a surprise birthday party for Eduardo, for which they had "stayed up all night making tamales, wrapping their gift, and blowing up balloons" in preparation. *Id.* Additional facts attesting to the intimacy and longevity of their relationship are pled at ¶¶ 5, 7, and 21. Like the plaintiff in *Garlick*, these facts firmly establish that Ms. Lopez and Mr. Garcia shared the kind of intimate cohabitating relationship that warrants Constitutional protection.

Defendants cite to *literally zero* relevant authority supporting their contention that Ms. Lopez lacks standing. Their sole argument is an undeveloped analogy to state law, whereby they suggest that because California courts have concluded that a relationship not formalized by marriage is insufficient to allow the surviving party to recover wrongful death damages, "[i]t is logical to conclude this same sentiment would extend to the constitutional intimate association claims." (Doc. 24, pg. 6). In fact, that is not logical. Constitutional protections of familial association under the First and Fourteenth Amendments are governed by federal law, the jurisprudence of federal courts, and the Supremacy Clause; standing for wrongful death claims is governed by state statutes. Ms. Lopez is not suing for wrongful death; she is suing only for her loss of familial association under the First and Fourteenth Amendments.

Even relying on these facts within the four corners of the FAC alone, the evidence demonstrates that Ms. Lopez and Juan Garcia shared an intimate, family relationship worthy of Constitutional protection. At the very least, sufficient facts exist that the existence of such a relationship is plausible. Therefore, this Court should deny Defendants' motion to dismiss Eva Lopez as a Plaintiff.

### B. Plaintiff Eduardo Lopez Has Standing

Defendants also challenge Eduardo Lopez's standing in this matter. Like his mother, Ms. Lopez, Eduardo Lopez has sued for loss of familial association under the First and Fourteenth Amendments. Eduardo Lopez also brings wrongful death and survival claims. As addressed *supra*, constitutional claims for a person's loss of familial association are governed by federal law. State law may inform standing for (a decedent's) survival claims, to the extent such state laws are not inconsistent with the purposes of the Civil Rights Act, 42 U.S.C. § 1983. See *Robertson v. Wegman*, 436 U.S. 584, 588-89 (1978) (citing 42 U.S.C. § 1988). Standing for wrongful death and survival state law claims generally is governed by state law. As with the preceding section regarding Ms. Lopez's standing, confusion over this distinction plagues Defendants' analysis of Eduardo Lopez's standing.

### 1. Standing to Bring Wrongful Death and Survival Claims

Defendants challenge Eduardo's standing to bring wrongful death claims as Juan Garcia's legal son pursuant to Cal. Code Civ. Pro. §§ 377.60 and survival claims as a co-successor in interest to Juan Garcia pursuant to Cal. Code Civ. Pro. §§ 377.10 et seq. (Doc. 24, p. 4). However, as with their challenges to Ms. Lopez's standing, Defendants cite no relevant authority to support their argument.

Eduardo Lopez has standing because he is a child of Juan Garcia as a matter of California law. *A.G. v. County of Los Angeles*, 28 Cal.App.5th 373 (2018) clearly lays out why state statutes force this conclusion:

> The right to sue for wrongful death is determined by statute in California. Code of Civil Procedure section 377.60, subdivision (a) permits, among others, the children of a decedent, or their personal representative, to sue. Probate Code section 6450, which applies in situations like the one presented to this court, where the decedent dies intestate, provides that the relationship of parent and child exists "between a person and the person's natural parents." (Prob. Code, § 6450, subd. (a).) In turn, the Probate Code establishes that "[a] natural parent and child relationship is established where that relationship is presumed and not rebutted pursuant to the Uniform Parentage Act (UPA), (Part 3 (commencing with § 7600) of Division 12 of the Family Code)." (Prob. Code, § 6453, subd. (a).) Thus, the statute "contains the rules for determining who is a 'natural parent.'" (*Estate of Burden* (2007) 146 Cal.App.4th 1021, 1026 [53 Cal. Rptr. 3d 390].)

*A.G.*, 28 Cal.App.5th at 377. The Court further elaborated:

> The Family Code provides, in section 7601, that a "natural parent" is "a nonadoptive parent established under this part, whether biologically related to the child or not." Section 7611 defines a presumed parent. As relevant here, a presumed parent is one who

"receives the child into his or her home and openly holds out the child as his or her natural child." (Fam. Code, § 7611, subd. (d).)

*A.G.*, 28 Cal.App.5th at 377.  Finally, the Court explained that under California law, a nonbiological parent can be a presumed parent, and that precedent is clear that evidence that a presumed parent is *not* a biological parent does not, alone, rebut this presumption.  *Id.* at 377-78.  Applying these statutes, the Court concluded that "Defendants have not asserted . . . facts other than biology that would rebut the presumption in this case[;]" "that 'from the time A.G. was one, [decedent] was the only father he knew[;]' and that 'unrebutted testimony established that [decedent] held A.G. out as his child.'"  *Id.* at 378.

Thus, the child in *A.G.* was legally the child of his non-biological, non-adoptive, deceased father, and as such, was permitted to bring a wrongful death claim for his father's death.  *Id.*  That case is not fairly distinguishable from the present case.

The Court in *A.G.* did not address standing for survival claims, but the same analysis applies. Under Cal. Code Civ. Pro. § 377.31, "[a] cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest, subject to Chapter 1 (commencing with Section 7000) of Part 1 of Division 7 of the Probate Code, and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest." In turn, Prob. Code § 7000 provides that "title to a decedent's property passes on the decedent's death to the person to whom it is devised in the decedent's last will or, in the absence of such a devise, to the decedent's heirs as prescribed in the laws governing intestate succession."  The laws governing intestate succession in terms of parent-child relationship are found in Prob. Code § 6450, *et seq*.  *A.G.*, 28 Cal.App.5th at 378.  From there, the analysis in *A.G.* forces the conclusion that Eduardo Lopez also has standing under California law to bring a survival claim for the death of Juan Garcia.

Here, like in *A.G.*, Juan Garcia took Eduardo Lopez into his home, raised him, and held Eduardo Lopez out as his own child since Eduardo Lopez was three years old.  (¶ 5).  Additional facts support this. For example, Juan Garcia and Eduardo Lopez, along with Eva Lopez, A.G., and E.G., lived together as a family, supporting the fact that Juan Garcia took Eduardo Lopez into his home.  (¶¶  4-5, 7, 21).  And Juan Garcia loved and treated Eduardo Lopez equal to A.G. and E.G.—so much so that at the time the FAC was filed, Eduardo Lopez was unaware that Juan Garcia was not his biological father.  (¶ 5).  This powerfully supports that Juan Garcia truly held Eduardo Lopez out as his own son.  Applying this to the

relevant California statutes, Juan Garcia was the presumed parent of Eduardo Lopez, who in turn is Juan Garcia's son and successor in interest, entitled to bring wrongful death and survival claims in this action.

Defendants cite only to *Terry v. City of Pasadena,* 2019 U.S. Dist. LEXIS 167098 (C.D. Cal. June 17, 2019) to refute the holding reached in *A.G.* But *Terry* is irrelevant because it concerns a plaintiff's standing to bring a Fourteenth Amendment claim—not a First Amendment, wrongful death, or survival claim. 2019 U.S. Dist. LEXIS at *13-14.

Attempting to fit a round peg into a square hole, Defendants misrepresent the *Terry* holding by their citation to footnote 2 in *Terry*, creating the false impression that *A.G.* was considered and rejected there. The plaintiffs in *Terry* attempted to argue standing based on a case they called "*A.G.*," that they simply referred to, without citation, as a "2018 Ninth Circuit Case." *Terry*, 2019 U.S. Dist. LEXIS 167098 *13-14, FN2. But after finding only a Central District of California case by that name (**not the California Court of Appeal opinion discussed *supra***), the Court disregarded that argument, noting that "Ninth Circuit and Supreme Court precedent controls the court's analysis [of Fourteenth Amendment standing]." *Id.* Defendants refer to this footnote, but fail to mention that the *Terry* court did not actually consider or even identify the published *A.G.* case from the California Court of Appeal that Plaintiffs cite here. (Doc. 24, pg. 5). Since *Terry* never addressed *A.G. v. County of Los Angeles*, 28 Cal.App.5th 373 (2018), *Terry* cannot change the inexorable conclusion required by *A.G.* that Eduardo was Juan Garcia's son as a matter of California law.

Defendants' only remaining argument on this issue is that the analysis in *A.G.* should not apply to Eduardo Lopez's standing because Eduardo Lopez is no longer a minor. But Defendants offer no authority to support their claim. Further, it makes no sense why Eduardo Lopez could be included as a successor in interest under state probate code as long as he was a minor, but would thereafter be cut off. Defendants warn that by embracing the clearly laid out statutory analysis in *A.G.*, this Court would "essentially create standing for a new class of individuals[,]" "who are neither the biological nor the adoptive child of the decedent." (Doc. 24, pg. 6). In reality, this Court cannot create what the California Court of Appeal already has recognized as binding California law. The *A.G.* Court laid out with clarity the relevant statutes establishing Eduardo Lopez as Juan Garcia's son. Applying state law to survival and wrongful death claims is precisely what this Court is supposed to do here.

Eduardo Lopez is Juan Garcia's son under California law, with standing to bring wrongful death and survival claims related to his father's death.  Accordingly, this Court should deny Defendants' motion to dismiss Eduardo Lopez's wrongful death and survival claims for claimed lack of standing.

### 2.  Standing to Bring Loss of Familial Association Claims

Though Defendants fail to explicitly argue that Eduardo Lopez lacks standing to bring a loss of familial association claim, the vagueness of Defendants' motion requires Plaintiffs to briefly address the issue.

It is well established that a parent has a "fundamental liberty interest" in "the companionship and society of his or her child" and that "the state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. § ] 1983*." Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 753, (1982)).  "This constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." *Lee,* 259 F.3d at 685 (citing *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987)).  As shown in the preceding section, Eduardo Lopez was Juan Garcia's son under California law.  Therefore, like any other son, he may bring a Fourteenth Amendment claim for loss of familial association with his father.

Moreover, even if Eduardo were not Juan's legal son, he would have a First Amendment claim for loss of familial association, as his mother does.  The boundaries of a family are not drawn by blood.  "[B]iological relationships are not exclusive determination of the existence of a family." *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 843 (1977).  Rather, "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children, as well as from the fact of blood relationship.  *Id*. at 844 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 231-33 (1972)).  "No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of a blood relationship." *Id*.

Defendants analogize to *Terry, supra*, to challenge Eduardo Lopez's standing to bring a Fourteenth Amendment claim, pointing out that, like here, plaintiffs there also asserted that "the decedent

was the only father the minor knew [for] his entire life" and that the minor "had been held out as decedent's child." (Doc. 24, pg. 5). In *Terry*, the Eastern District court ruled that the minor did not have standing to bring a Fourteenth Amendment claim because the complaint did not allege a "custodial, biological, or legal relationship" between the minor and the Decedent. 2019 U.S. Dist. LEXIS at *15.

It is unclear how long or how consistently the decedent in *Terry* cared for the unrelated minor child or whether they cohabitated—and if so, whether their cohabitation was uninterrupted. Notably, the Court also denied standing for another minor *who was the decedent's biological son*, stating that no evidence existed that the decedent raised or "otherwise resumed responsibility" for the child. *Id*. at *12-13. Juan Garcia had a strong custodial relationship with his son, Eduardo. And importantly, *Terry* did not consider whether the minor children had a First Amendment claim for loss of familial association, as Plaintiffs pled and briefed here.

Even if Eduardo were not the legal son of Juan Garcia under California law, he clearly possessed the type of exclusive, intimate, cohabiting relationship with his "father" that Courts have recognized is entitled to protection under the First Amendment, as discussed above with respect to Eduardo's mother, Eva Lopez.

Juan Garcia raised Eduardo Lopez (now 24 years old) as his own son since Eduardo Lopez was three years old. (¶ 5). Juan Garcia and Ms. Lopez, Eduardo Lopez's mother, had two additional children together, giving Eduardo Lopez two brothers, A.G and E.G. (¶¶ 3, 21). They all lived together as a family. (¶ 4). Juan Garcia loved and treated Eduardo Lopez equal to A.G. and E.G., and held out Eduardo Lopez out as his own son—so much so that, at the time Plaintiffs' filed their FAC, Eduardo Lopez remained unaware that Juan Garcia was not his biological father. (¶ 5). Indeed, Juan Garcia was a devoted father to Eduardo Lopez and his other two children. (¶ 21). He was always by their side when they were sick, coordinated his work schedule with Ms. Lopez so that one of them would always be home for the kids, and spent his time off taking Eduardo Lopez and his brothers to parks, ice cream, and trying new activities together, such as fishing. *Id*. Juan Garcia also taught values to Eduardo Lopez, such as the importance of looking out for his siblings and his family. *Id*. And on Eduardo Lopez's surprise birthday party held the day before Juan Garcia was killed, discussed *supra*, Juan Garcia was described as

"radiating happiness[,]" and Plaintiff Eva Lopez's mother mentioned "never having heard him laugh so much." *Id.*

Supreme Court jurisprudence has consistently asserted that the bonds of familial association are determined by the nature of the underlying relationship, not limited by biology. If that concept has any vitality, Eduardo Lopez must have standing here. Indeed, it would be an absurd result to deny Eduardo Lopez standing to bring his loss of familial association claim, but allow his mother and two brothers to proceed on theirs. A constitutionally protected parent-child relationship—one that that presupposes "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life"—is precisely what Eduardo Lopez and Juan Garcia had. *Roberts*, 468 U.S. at 609.

### C.  Plaintiffs Have Alleged Sufficient Facts to Support a *Monell* Claim

A *Monell*[4] claim must: (1) "'contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively[;]" and (2) plead "the factual allegations that … plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.'" *Starr*, 652 F.3d at 1216 (citations omitted).

"To survive a motion to dismiss [a *Monell* claim], 'a bare allegation that government officials' conduct conformed to some ***unidentified*** government policy or custom' is insufficient[.]" *Shelley v. Cnty. of San Joaquin*, 954 F. Supp. 2d 999, 1009 (E.D. Cal. 2013) (emphasis added) (quoting *A.E. ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012)). After *Iqbal/Twombly*, the Supreme Court reaffirmed that there is no heightened pleading standard for *Monell* claims, and that plaintiffs in civil rights cases need only plead the factual basis for their claims "simply, concisely, and directly." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (citations omitted).

Recognized paths to *Monell* liability include: (1) an unconstitutional custom or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train or failure to have a needed policy, and (3) a final policy-maker's involvement in or ratification of the conduct underlying the violation of rights. *Clouthier v. Cnty. Of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010).

---

[4] See *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

Plaintiffs' *Monell* claims must survive dismissal even if the Court finds plaintiffs only sufficiently alleged facts under one of the three theories. *See Dorger v. City of Napa*, No. 12-cv-440-YGR, 2012 U.S. Dist. LEXIS 124551, at *7-8 (N.D. Cal. Aug. 31, 2012).

Plaintiffs' counsel's method of pleading their *Monell* claim has been repeatedly approved by judges in the Eastern and Northern Districts. *See, e.g., Johnson v. Shasta Co.*, 83 F. Supp. 3d at 930–933 (allegations that Shasta County failed to take action to supervise or train provided sufficient factual basis for a *Monell* claim to survive a motion to dismiss); *Moore v. City of Vallejo*, 73 F. Supp. 3d 1253 (E.D. Cal. 2014) (same); *Neuroth v. Mendocino Cnty.*, No. 15-cv-03226-NJV, 2016 U.S. Dist. LEXIS 11109, at *13–16 (N.D. Cal. Jan. 28, 2016) (denying municipality's motion to dismiss *Monell* claim based in part on allegations of failures to implement and enforce policies, and concluding: "[t]he court finds that County Defendants are attempting to assert too high a burden at this, the pleading stage."); *Lopez v. Cnty. of Tulare*, No. CV-F-11-1547-LJO-BAM, 2012 U.S. Dist. LEXIS 1833, at *25 (E.D. Cal. Jan. 6, 2012) (same); *M.H. v County of Alameda*, 90 F. Supp. 3d 889, 900–01 (N.D. Cal. 2013) (allegations that County and jail healthcare provider's failure to institute certain procedures and policies, failure to coordinate healthcare assessments, failure to train, hire, supervise, monitor and instruct employees and denial of adequate care for serious medical needs, and medical director's approval, tolerance and/or ratification provided sufficient factual basis for a *Monell* claim to survive a motion to dismiss); *Atayde v. Napa State Hospital*, 255 F.Supp.3d 978, 996-98 (E.D. Cal. 2017) (ratification claim against County).[5]

_____

[5] See also cases brought by other counsel: *IDC v. City of Vallejo*, No. 2:13-cv-1987 DAD, 2014 U.S. Dist. LEXIS 78487, at *13–20 (E.D. Cal. June 6, 2014) (similar *Monell* pleading); *Cook v. City of Fairfield*, No. 2:15-cv-02339-KJM-KJN, 2017 U.S. Dist. LEXIS 158010, *12-15 (E.D. Cal. Sept. 26, 2017) (similar *Monell* pleading); *Bass v. City of Fremont*, No. C12-4943 TEH, 2013 U.S. Dist. LEXIS 32590, at *11– *12 (N.D. Cal. Mar. 8, 2013) (plaintiff's allegations both that officers were engaged in a pattern and practice of using unnecessary and excessive force and falsely reporting crimes, and that municipality demonstrated deliberate indifference to such constitutional violations by failing to take necessary appropriate or adequate measures to prevent future occurrences, were "plausible" and "sufficient to give the municipal entity notice of the specific policies, customs, and practices that [we]re alleged to have caused the deprivation of [the plaintiff's] rights[.]"); *Williams v. County of Alameda*, 26 F.Supp.3d 925, 947-48 (N.D. Cal. 2014) (*Monell* pleading sufficient where plaintiff alleged individual defendants did not know what constitutes reasonable force or proper warrantless entry, arrest, seizure, or search because defendant county failed to train); *Scalia v. Cty. of Kern*, 308 F.Supp.3d 1064, 1079 (E.D. Cal. 2018) (*Monell* pleading sufficient where allegations of insufficient training of nurses were "more than unspecified recitations of the cause of action"); *Nunes v. Cty. of Stanislaus*, No. 1:17-cv-00633-DAD-SAB, 2017 U.S. Dist. LEXIS 137231, *15-16 (E.D. Cal. Aug. 25, 2017) (*Monell* pleading sufficient

Here, Plaintiffs have identified and described unconstitutional policies, customs, and programmatic failures to train that are closely aligned with the actual misconduct of Defendant Ackman to show that they may plausibly recover from Defendant County under any one of the three theories of *Monell* liability recognized in *Clouthier*.  (¶ 39-40).  Plaintiffs also allege that Defendant County's "failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; as well as their unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants" was a moving force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's rights.  (¶¶ 41-44).  *See Monell*, 436 U.S. at 694-695 (Municipal liability exists where a government's policy or custom is the moving force of the constitutional violation at issue).

### 1. Official Policies/Customs

Plaintiffs may hold Defendant County liable "'when implementation of its official policies or established customs inflicts the constitutional injury.'"  *Clouthier*, 591 F.3d at 1249 (quoting *Monell*, 436 U.S. at 708) (citation omitted).  Plaintiff can also establish the County's liability by "'demonstrating that … the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'"  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).

Here, Plaintiffs have identified specific customs and policies – tied to the particular facts and Defendant Ackman's actual misconduct here – by Defendant County that plausibly would give rise to municipal liability under *Monell*:

    a.    To use or tolerate the use of unlawful deadly force including permitting and training officers (i) to use deadly force when faced with less than an immediate threat of death or serious bodily injury, (ii) to use deadly force prematurely, or as a 'first resort,' or when facing a mere potential threat; (iii) to use deadly force without giving a proper warning when one would be feasible; and (iv) to fire unnecessary gunshots after any claimed threat has been rendered less than an immediate threat;

---

where plaintiffs alleged county practices allowed for removal of children without due process and absent exigent circumstances, citing no prior specific instances or patterns); *Duenez v. City of Manteca*, No. CIV. S-11-1820 LKK/KJN, 2012 U.S. Dist. LEXIS 23267, *24-26 (E.D. Cal. Feb. 22, 2012) (allegations that defendant with final policymaking authority made statements supporting the shooting of plaintiff after viewing video evidence "provide[d] fair notice of the factual basis [for a] *Monell* claim[,]" explaining that "it is clear plaintiffs seek to prove the existence of a policy or custom by showing that [defendant policymaker], at the least, ratified the [shooting.]").

b.    To cover-up violations of constitutional rights, such that members of the department are led to believe in practice that they can exercise force and violate rights with impunity, by any or all of the following:

    i.    by failing to properly investigate and/or evaluate complaints or incidents of excessive and unreasonable force, unlawful seizures;

    ii.    by ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful police activity; and

    iii.    by allowing, tolerating, and/or encouraging law enforcement officers to: fail to file complete and accurate police reports; file false reports; make false statements; intimidate, bias and/or "coach" witnesses to give false information and/or to attempt to bolster officers' stories; and/or obstruct or interfere with investigations of unconstitutional or unlawful police conduct, by withholding and/or concealing material information;

c.    To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers and Sheriff's Office personnel, whereby an officer or member of the department does not provide adverse information against a fellow officer or member of the department;

d.    To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (c) above, with deliberate indifference to the rights and safety of Plaintiffs and the public, and in the face of an obvious need for such policies, procedures, and training programs.

(Doc. 18, ¶ 39).

Several of these factually identified customs or practices are almost identical to those in *IDC v. City of Vallejo*, *supra*, 2014 U.S. Dist. LEXIS 78487, as well as several other complaints drafted by Plaintiff's counsel (at p. 14, above: *Johnson v. Shasta Co., supra., Moore v. City of Vallejo, supra., Lopez v. Tulare Co., supra, M.H. v. Alameda Co., supra.*), or similar complaints approved by other district courts (*see* footnote 5, above).  In *Johnson*, the court cited customs or practices identified in the Complaint (nearly identical to those cited above from the instant case) and concluded that "Plaintiffs' allegations are sufficient to state a *Monell* claim on the basis of official policy or custom . . . [and] give Sutter County fair notice to enable it to defend itself in this matter."  83 F.Supp.3d at 931.

Plaintiffs have identified Defendant County's deficient customs, policies, and procedures with enough specificity to "state a *Monell* claim on the basis of official policy or custom" and "give [Napa] County fair notice to enable it to defend itself in this matter."  *Johnson*, 83 F.Supp.3d at 931.  Plaintiffs

have further described how these policies were a moving force in Defendant Ackman violating Juan Garcia's constitutional rights by failing to apply generally accepted law enforcement tactics—including failing to warn Juan Garcia before using deadly force, even though a warning was feasible under the circumstances, and failing to evaluate the need for continued deadly force between gunshots. (¶¶ 23, 25, 26). These allegations are sufficient to state a plausible *Monell* claim. Discovery is now necessary to more thoroughly flesh them out within the context of this case.

## 2. Omissions/Failures Establishing Deliberate Indifference

Defendant County "may be held liable under § 1983 for acts of 'omission,' when such omissions amount to the local government's own official policy." *Clouthier*, 591 F.3d at 1249. One such omission is the County's failure to train its police officers, where "'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

A plaintiff can prove a "failure-to-train" claim against a municipality "without showing a pattern of constitutional violations where a 'violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006); *see also* Ninth Circuit Model Jury Instruction No. 9.8. Defendants incorrectly claim that liability for a custom of failing to train cannot be based on an "isolated incident." (Doc. 24, p. 8). "Plaintiffs need not make such a showing [of repeated misconduct] if the constitutional violation was a 'highly predictable consequence' of the failure to train." *Martinez v. City of Pittsburg*, CAND No. 17-cv-04246-RS, 2019 U.S. Dist. LEXIS 37904 at *21, 2019 WL 1102375 (N.D. Cal. Mar. 8, 2019) (citing *Long*, 442 F.3d at [1186], 1188).

Alternatively, a municipality's failure to institute a policy in the face of an obvious need for such a policy to prevent constitutional violations—i.e., a "policy … of inaction," also supports *Monell* liability. *Oviatt v. Pearce*, 954 F.2d 1470, 1474–5, 1477 (9th Cir. 1991). "This occurs when the need for more or different action is so obvious, and the inadequacy of the current procedure so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 1475 (quoting *City of Canton*, 489 U.S. at 390).

1    Accordingly, Plaintiffs alleged the failure to train and failure to institute policies and procedures at

2    Paragraph 39(d) of the FAC:

3        d.    To fail to have and enforce necessary, appropriate, and lawful policies, procedures,
        and training programs to prevent or correct the unconstitutional conduct, customs,

4            and procedures described in this Complaint and in subparagraphs (a) through (c)
        above, with deliberate indifference to the rights and safety of Plaintiffs and the

5            public, and in the face of an obvious need for such policies, procedures, and

6            training programs.

7    As the FAC makes clear, Plaintiffs allege that Defendant County failed to have and enforce necessary and

8    appropriate policies and training.  (¶ 39(d)).  Without the benefit of discovery, it is impossible to plead the

9    absence of something (e.g. a policy of inaction) with any more particularity than that.  Defendants'

10   motion to dismiss should be denied, and Plaintiffs should be permitted to begin discovery to establish an

11   evidentiary basis for these claims.

12   **3.  Ratification**

13   Plaintiffs may hold Defendant County liable by showing that an official with final policy-making

14   authority "'ratified a subordinate's unconstitutional decision or action and the basis for it.'"  *Clouthier*,

15   591 F.3d at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)).  To show

16   ratification, a plaintiff must prove that the "authorized policymakers approve a subordinate's decision and

17   the basis for it."  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (citing *City of St. Louis v.

18   Praprotnik*, 485 U.S. 112, 127 (1988)).  A policy maker who fails to discipline officers, after the fact, for

19   an incident of excessive force may be held liable under Monell for ratifying the use of excessive force.

20   *Larez v. City of Los Angeles*, 946 F.2d 630, 645-646 (9th Cir. 1991) (holding police chief liable for

21   ratifying excessive force by officers by signing a letter denying the plaintiff's complaint when he should

22   have disciplined the officers and established new police procedures).  See also *Watkins v. City of

23   Oakland*, 145 F.3d 1087, 1093-94 (9th Cir. 1998) (no qualified immunity for police chief who ratified

24   officer's misconduct by signing internal affairs report dismissing complaint despite evidence of officer's

25   use of excessive force in the report).  "Ordinarily, ratification is a question for the jury."  *Iopa*, 176 F.3d at

26   1238–39.

27   Here, just like where virtually identical ratification claims survived motions to dismiss (see

28   *Atayde, supra,* 255 F.Supp.3d at 996-98; *Neuroth*, 2016 U.S. Dist. LEXIS 11109, at *13–16).  See also

*Duenez*, 2012 U.S. Dist. LEXIS 23267 at \*24-26.  Plaintiffs allege that the details of this incident have been revealed to the authorized policy makers within Napa County after a full investigation.  (¶ 42).  Plaintiffs also allege "that such policy makers have direct knowledge of the fact that the shooting of Juan Garcia was not justified, but represented an unconstitutional use of unreasonable, excessive, and deadly force."  *Id*.  The "policymakers of Defendant County have approved of Defendant Ackman's shooting of Juan Garcia, and made a deliberate choice to endorse Defendant Ackman's shooting of Juan Garcia and the basis for that shooting."  *Id*.  By doing so, "policymakers of Defendant County have shown affirmative agreement with the individual defendant officer's actions, and have ratified the unconstitutional acts of the Defendant Ackman and others."  *Id*.  Finally, policy-making officers for Defendant County "were and are aware of a pattern of misconduct and injury caused by Defendant County law enforcement officers similar to the conduct of Defendant Ackman described herein, but failed to discipline culpable law enforcement officers and employees and failed to institute new procedures and policy within the county."  (¶ 43).

In sum, Plaintiffs' *Monell* claim is well-pleaded, and similarly pleaded claims by Plaintiffs' counsel and others have survived motions to dismiss in this District and the Eastern District.  Defendants have fair notice of the basis for Plaintiffs' claims; the Complaint describes the types of customs, policy deficiencies, failures to train, and ratifications that would give rise to *Monell* liability, as well as the causal connection to the violation of rights.  See *Neuroth, supra, Atayde, supra, Duenez, supra.*  Accordingly, this Court should deny Defendant County's Motion to Dismiss Plaintiff's *Monell* claim.

### D.  Defendants Have Not Met Their Burden to Support Bifurcation, Which Is Unnecessary and Would Increase the Parties' Costs and Work

Without developing any arguments at all, Defendants simply request that this Court "bifurcate the trial and discovery of the individual liability claims and the *Monell* claims."  (Doc. 24, pp. 2-3).  Defendants also do not identify what they contend would be solely *Monell*-related discovery, or any unfair prejudice motivating their request.  Bifurcation of trial is certainly premature at this stage.  Bifurcation of discovery also would be improper, and would only boost the number of depositions and attorney-hours to do two rounds of highly contested discovery, when one round of normal discovery would suffice.

"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, [or] . . . claims[.]"  Fed. R. Civ. P. 42(b).  Rule 42(b) "confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings . . .".  *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).  "Factors to be considered when determining whether to bifurcate a trial include: avoiding prejudice, separability of the issues, convenience, judicial economy, and reducing risk of confusion."  *Bates v. UPS*, 204 F.R.D. 440, 448 (N.D. Cal. 2001) (citation omitted).

In general, bifurcation is the exception, not the rule.  Where, as here, the evidence in two (or more) claims overlaps substantially, the "normal trial procedure" is to decline a motion to bifurcate and to try such claims together in a unitary trial.  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (citation omitted); *see also Martinez v. Robinson*, No. 99 Civ. 11911 (DAB) (JCF), 2002 U.S. Dist. LEXIS 4454, at *5–6 (S.D.N.Y. Mar. 19, 2002) (quoting *Miller v. Am. Bonding Co.*, 257 U.S. 304, 307 (1921) ("[T]he ***presumption*** is that all claims in a case will be ***resolved in a single trial***, and 'it is only in ***exceptional instances*** where there are special and persuasive reasons for departing from this practice that distinct causes of action asserted in the same case may be made the subject of separate trials.'") (emphasis added); *Monaghan v. SZS 33 Assocs., L.P.*, 827 F. Supp. 233, 245 (S.D.N.Y. 1993) (holding that "[s]eparate trials remain the exception, rather than the rule, ***regardless of the nature of the action***.") (emphasis added) (citations omitted); *Buscemi v. Pepsico, Inc.*, 736 F. Supp. 1267, 1271 (S.D.N.Y. 1990) (holding that, generally, "efficient judicial administration . . . favor[s] having ***only one trial*** whenever possible.") (emphasis added).

It is widely accepted that the party moving for bifurcation bears the burden of justifying this departure from normal trial practice.  *Fitbit, Inc. v. Aliphcom*, No. 5:15-cv-04073-EJD, 2016 U.S. Dist. LEXIS 69993, at *3 (N.D. Cal. May 27, 2016); *see also Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992) (holding that the bifurcation movant must demonstrate that bifurcation "will promote judicial economy and avoid inconvenience or prejudice to the parties."); *Burton v. Mountain W. Farm Bureau Mut. Ins. Co.*, 214 F.R.D. 598, 612 (D. Mont. 2003) (same); *Toler v. Gov't Emps. Ins. Co.*, 309 F.R.D. 223, 225 (S.D.W. Va. 2015) (same); *Griffith v. Allstate Ins. Co.*, 90 F. Supp. 3d 344, 346 (M.D. Pa. 2014 (same).

Defendants have failed to bear this burden.  In fact, briefing on bifurcation is nowhere to be found in the entire "Legal Arguments" section of Defendants' Motion to Dismiss.  (Doc. 24).  Defendants' briefing on the issue is limited to some general standards addressed in the motion's "Introduction" and "Legal Standards" sections and an unsupported statement in the "Conclusion" section that "bifurcation would support judicial economy."  (Doc. 24, pg. 1, 3-4, 10).[6]

Here, bifurcation of trial and/or discovery would *not* support judicial economy because of the substantial overlap of evidence related to the *Monell* and individual liability claims.  Specifically, evidence of Defendants' policies and training relevant to Plaintiffs' *Monell* claim also goes to the standards to establish Defendant Ackman's liability for federal claims, to assess qualified immunity, and for negligence.  Where, as here, an officer violates his basic police academy training or his department's policies and training, he has notice that his conduct is unreasonable and therefore cannot claim entitlement to qualified immunity.  *See, e.g., Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) ("training materials" were relevant to whether force was unlawful and whether a reasonable officer would have been on notice); *Headwaters Forest Def. v. Cnty. of Humboldt ("Headwaters II")*, 276 F.3d 1125, 1131 (9th Cir. 2002) (no qualified immunity where officers violated regional and statewide police protocol); *Davis v. Mason Cnty.*, 927 F.2d 1473, 1484–85 (9th Cir. 1991) (testimony of plaintiff's police practices expert that officers violated law enforcement standards was properly admitted); *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1162, n.7, 1168, n.9 (9th Cir. 2011) (same); *Groh v. Ramirez*, 540 U.S. 551, 564 n.7 (2004) (holding that defendant officer's violation of his department's guideline is relevant to, though not dispositive of, a defendant-officer's entitlement to qualified immunity, because such guidelines "underscore that petitioner should have known" that he should not have acted unreasonably by, for example, executing a "a patently defective warrant.").

---

[6] As a bifurcation standard, Defendants cite to *Huizar v. City of Anaheim*, 840 F.3d 592 (9th Cir. 2016), for the proposition that the Court may bifurcate a trial to avoid a "difficult question" by dealing with an easier, dispositive issue.  (Doc. 24, pg. 3).  Defendants do not mention that the difficult question in *Huizar* was that the defendants in a police shooting case introduced evidence of the decedent's gang affiliation in the liability phase, when the Ninth Circuit held that if such highly prejudicial and generally irrelevant evidence were admitted at all, it should have been done in a bifurcated damages phase.  840 F.3d at 601-603.

In addition, under California law, a peace officer may be held liable for negligence because "'a public employee is liable for an injury caused by his act or omission to the same extent as a private person,' except as otherwise specifically provided by statute." *Lugtu v. California Highway Patrol*, 26 Cal. 4th 703, 715 (2001) (quoting Cal. Gov't Code § 820(a)).  Officers have "a duty 'to perform their official duties in a reasonable manner,'" and "a law enforcement officer has a duty to exercise reasonable care for the safety of those persons whom the officers stops . . ." *Id.* at 717–18.  *Lugtu* approved the determination of the standard of care based on the department's training and policy materials, as well as the plaintiff's expert's testimony.  *Id.* at 720–24; *see also Dillenbeck v. City of L.A.*, 69 Cal. 2d 472, 480 (1968) (holding, in a negligence case, that a trial court should have admitted a police department's rules as "evidence of the component requirements of due care[;]" "[the] safety rules of an employer are . . . admissible as evidence that due care requires the course of conduct prescribed in the rule."); *Grudt v. City of L.A.*, 2 Cal. 3d 575, 588 (1970) (a police department's manual was relevant to plaintiff's negligence claim, because it "prescribed rules regarding occasions for the limited use of firearms by police officers.").

Accordingly where, as here, the evidence to prove the individual and *Monell* liability overlaps, a court should not bifurcate.  See *De Anda v. City of Long Beach*, 7 F.3d 1418, 1421 (9th Cir. 1993) (finding an abuse of discretion where the trial court bifurcated claims against individual sheriff deputies from claims against the Sheriff and the municipality, because the Sheriff's decisions might have contributed to a violation of the plaintiff's rights and a separate trial for the municipality "would likely be duplicative."); see also *Hunter v. City & Cnty. of S.F.*, No. 11-4911 JSC, 2012 U.S. Dist. LEXIS 146492, at *29 (N.D. Cal. Oct. 10, 2012) ("Where an overlap of factual issues exists between the claims, courts are reluctant to bifurcate the proceedings.") (citations omitted).

If discovery of Defendants' policies, customs, and training were bifurcated from discovery of the shooting itself, that would necessitate deposing Defendant Ackman and many investigating officers twice – once to find out what Sgt. Ackman says happened, and again to explore why he did what he did in light of his training and his department's policies, procedures, and customs.  The shooting really could not be fully understood in a vacuum.  Many witnesses would need to be re-deposed in round two to follow-up on policy, custom, or training issues that could easily and smoothly have been asked the first time.  The

parties would have to go through two rounds of expert reports and discovery – one round for the first summary judgment motion, and a second round for the second summary judgment motion and trial. Plaintiffs would be unfairly hamstrung to oppose a motion for summary judgment by Defendant Ackman without addressing how Defendant Ackman's conduct failed to conform to his own department's training and standards.

And, bifurcation of discovery would embolden defense counsel to object to every question and discovery request that he decided to be remotely related to his conception of *Monell* discovery (having never identified it in this motion), and would undoubtedly result in multiple discovery motions, increased costs and fees, and undue burden for the parties and the Court.

Bifurcation is an extreme measure.  In their motion, Defendants have not identified any evidence or discovery that is solely related to the *Monell* claims.  (Indeed, as shown above, Plaintiffs' *Monell* theories are closely tied to the facts of this shooting).  Nor have Defendants identified any unfair prejudice they would suffer in the course of normal discovery in this civil rights/wrongful death action.  Bifurcation would neither prevent prejudice or confusion, nor promote judicial economy.  Defendants have not met their burden to establish otherwise.

In 30 years of practice, handling hundreds of serious police misconduct cases in federal courts, Plaintiffs' counsel have never had a court bifurcate discovery.  Normal discovery has never been a problem for other law enforcement defendants.  Counsel on both sides are experienced in handling police misconduct cases, and have amicably handled many cases together – without the need for bifurcation of discovery or trial.  Accordingly, this Court should deny Defendants' request to bifurcate the individual liability and *Monell* claims for discovery and trial.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court deny Defendants' Motion to Dismiss/Bifurcate, or in the alternative, grant leave to amend any deficiencies in their First Amended Complaint.

//
//
//
//
//

Dated:  September 16, 2021                    HADDAD & SHERWIN

                                    By:    /s/ Michael Haddad
                                           MICHAEL J. HADDAD
                                           Attorneys for Plaintiffs