UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN GARCIA, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>COUNTY OF NAPA, et al.,<br><br>  Defendants. | Case No. 21-cv-03519-HSG<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION TO AMEND**<br><br>Re: Dkt. Nos. 57, 61 |

Before the Court are Defendants' motion for summary judgment and Plaintiffs' motion to amend. *See* Dkt. Nos. 57, 61. The Court held a hearing on the motions on December 15, 2022. *See* Dkt. No. 78. The Court **GRANTS** the motion for summary judgment as to all federal claims and **DENIES** the motion to amend for the reasons below. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and **DISMISSES** them **WITHOUT PREJUDICE** to their reassertion in state court.

**I.   BACKGROUND**

**A.   Factual Background**

On October 5, 2020, Defendant Sergeant David Ackman of the Napa County Sheriff's Office fatally shot Juan Garcia during a traffic stop. Mr. Garcia was unarmed. The incident was captured by Sgt. Ackman's body-worn camera and patrol car dashcam. *See* Dkt. No. 61-1 ("Blechman Decl."), Ex. C ("Dashcam"), Ex. D ("BWC"), Ex. J-3 ("Synchronized Videos" or "SV"). Plaintiffs are Mr. Garcia's children, life partner, and parents. *See* Dkt. No. 18 ("First Amended Complaint" or "FAC") ¶¶ 3–7. They sued Sgt. Ackman and Napa County for civil rights violations and wrongful death. *Id.* ¶¶ 1, 8–9. The following facts are undisputed unless otherwise noted.

Around 10:15 p.m. on October 5, 2020, Sgt. Ackman pulled Mr. Garcia's car over on Kaiser Road near State Highway 221 in Napa County. *See* Dkt. No. 68-2, Ex. 3 ("Ackman Dep.") 99:13–25, 107:3–7. When Mr. Garcia first drove by, Sgt. Ackman was parked in a patrol car on Syar Way. *Id.* 102:11–103:2. Sgt. Ackman testified that he decided to stop Mr. Garcia because it was a "high crime" area and there was "no reason for anybody to be in that area that time of night." *Id.* 100:5–13, 103:14–20. Knowing Mr. Garcia had driven down a dead-end road, Sgt. Ackman repositioned his patrol car and waited for Mr. Garcia to leave, planning to do an investigatory stop. *Id.* 98:14–22, 104:2–13. Mr. Garcia drove by again, this time with his headlights off. *Id.* 105:17–106:8; Dashcam 10:12:40–10:12:42.

Sgt. Ackman turned on his emergency lights and radioed in that he was performing a traffic stop and wanted cover. Ackman Dep. 106:9–13, 107:24–108:9. The body-worn camera footage begins at this point, but the audio does not begin until thirty seconds in. *See* BWC 0:00–0:30.[1]

The footage from the dashcam and body-worn camera shows the following. Mr. Garcia pulled over to the right side of the road, and within a few seconds opened his car door. SV 0:30–0:38; Dashcam 10:12:43–10:13:12. Sgt. Ackman got out of his car and pointed his gun at Mr. Garcia through the "V" of the driver's side door, using it as cover. SV 0:30–0:38; BWC 0:12–0:16. Mr. Garcia got out of his car and closed the door.[2] SV 0:39–0:42; BWC 0:19–0:21; Dashcam 10:13:16–10:13:19. With both arms by his sides, Mr. Garcia walked toward Sgt. Ackman, stopping roughly halfway between their vehicles. BWC 0:20–0:27; Dashcam 10:13:19–10:13:22. Sgt. Ackman moved away from the patrol car and toward Mr. Garcia, lowering his gun. BWC 0:20–0:27. Mr. Garcia briefly placed both hands behind his lower back,[3]

---

[1] The camera was designed to capture video without audio for thirty seconds before activation. *See* Dkt. No. 55.

[2] Before getting out, Mr. Garcia threw an object, later discovered to be his cell phone, over the top of his car. BWC 0:17–0:18; Dashcam 10:13:14–10:13:16. Sgt. Ackman testified that he did not see this. Ackman Dep. 118:15–119:6.

[3] Sgt. Ackman testified that he believed Mr. Garcia was going to "cuff up" at this point and thus holstered his gun. Ackman Dep. 121:7–17, 126:13–23. Mr. Garcia was holding his keys in his left hand. *See, e.g.*, Dashcam 10:13:24.

1  then dropped his left hand while keeping his right hand behind his back, where it remained for the

2  rest of their encounter. *Id.* 0:24–0:30; SV 0:44–0:48; Dashcam 10:13:23–10:13:25. Sgt. Ackman

3  gestured at Mr. Garcia and told him to "turn around"—this is the first verbal command captured

4  by the body-worn camera. BWC 0:26–0:31.

5         Instead, Mr. Garcia walked toward Sgt. Ackman, who retreated toward the back of the

6  patrol car and pointed his gun at Mr. Garcia again. BWC 0:31–0:36; Dashcam

7  10:13:27–10:13:32. Mr. Garcia stopped for several seconds and turned slightly to the side. BWC

8  0:34–0:43. In the video, he appears to be momentarily blinded by Sgt. Ackman's flashlight.[4] *Id.*

9  0:38–0:39. Mr. Garcia backed up a few steps, then advanced again on the driver's side of the

10 patrol car. *Id.* 0:40–0:44; SV 1:00–1:05; Dashcam 10:13:41–10:13:44. Sgt. Ackman ran around

11 the back of the patrol car to the front passenger side, positioning the car between them, and

12 retrained his gun on Mr. Garcia. BWC 0:42–0:51; SV 1:06–1:12; Dashcam 10:13:47–10:13:51.

13 Switching directions, Mr. Garcia maneuvered around the front of the patrol car toward Sgt.

14 Ackman. BWC 0:51–0:54; SV 1:13–1:16; Dashcam 10:13:51–10:13:54. Mr. Garcia continued to

15 advance, this time along the passenger side. BWC 0:52–0:57. Sgt. Ackman backpedaled with his

16 gun pointed at Mr. Garcia and yelled "stop" three times with escalating intensity. *Id.*

17        Sgt. Ackman then fired six shots over approximately two seconds, and Mr. Garcia fell to

18 the ground. *Id.* 0:58–1:03. Sgt. Ackman radioed "shots fired." *Id.* 1:04–1:05. He held Mr.

19 Garcia, visibly bleeding, at gunpoint from a distance until officers arrived, saying "stay there,"

20 "stay down," and "hang in there, sir." *Id.* 1:06–3:26. He also called for emergency medical

21 services, *id.* 2:00–2:04, and told dispatch: "He was chasing me around the car. Wouldn't show me

22 his hands," *id.* 2:31–2:41. Sgt. Ackman told the first officer who arrived "I don't know what he's

23 got under him. That's the whole problem here," and the officer placed Mr. Garcia in handcuffs.

24 *Id.* 3:24–3:45.

25        Sgt. Ackman's deposition testimony is largely consistent with the video, but Plaintiffs

26 assert the video does not reflect events described in portions of his testimony. First, Sgt. Ackman

---

[4] Sgt. Ackman testified that he accidentally shined his flashlight in Mr. Garcia's face at some point during their encounter. Ackman Dep. 121:2–10.

3

testified that when he initiated the traffic stop, Mr. Garcia sped up before abruptly pulling over, making Sgt. Ackman think there would be a car chase. Ackman Dep. 106:10–13, 108:22–25. Plaintiffs assert that the footage does not reflect this and note that Mr. Garcia was fully stopped within twenty seconds. Dkt. No. 68 ("Opp.") at 2–3. Second, Sgt. Ackman testified that at one point he reached for his radio, realized it was off, and saw Mr. Garcia "smirk" at him. Ackman Dep. 130:5–11, 131:17–22. Plaintiffs again assert that the footage does not reflect this. Opp. at 4. Third, Sgt. Ackman testified that he told Mr. Garcia to get back in the car and to show his hands, but Plaintiffs note that there is no objective evidence of these commands because they were not captured by the audio. *Id.* at 4 n.2; Ackman Dep. 120:4–9, 125:12–21.

  Sgt. Ackman testified that he feared for his life during his encounter with Mr. Garcia, and that as Mr. Garcia advanced, he believed they "were gonna have a shootout." Ackman Dep. 130:13–24; *see also id.* 118:2–9, 135:25–136:7, 140:22–141:16, 142:19–24, 152:9–12. He stated that when he first pulled Mr. Garcia over, he did not have any facts suggesting that Mr. Garcia was armed. *Id.* 113:10–21. Rather, Sgt. Ackman asserted that he first drew his gun based on Mr. Garcia's "suspicious behavior before the car stop," and that he intended to hold Mr. Garcia at gunpoint until cover arrived. *Id.* 114:22–116:6. He stated that he thought Mr. Garcia was "probably" under the influence of something but did not consider that Mr. Garcia might be mentally ill, drunk, or confused.[5] *Id.* 137:17–138:6. Although he did not see a gun, Sgt. Ackman said he believed Mr. Garcia had a weapon because of the position of his right hand behind his back near his waistband. *Id.* 136:21–137:9, 143:12–17. Sgt. Ackman testified that he could not continue to retreat because there were tripping hazards in the road, he had lost cover, and Mr. Garcia was gaining on him. *Id.* 134:8–9, 142:19–24, 152:3–12. Sgt. Ackman had a taser, an expandable baton, and pepper spray, but said he did not consider using them. *Id.* 81:25–82:2, 140:4–12. Sgt. Ackman testified that he believed Mr. Garcia was roughly 15 to 21 feet away

---

[5] Mr. Garcia's blood alcohol level was .312% at the time of the shooting. Blechman Decl., Exs. G, G-1. Plaintiffs do not contest this fact but argue that it is not relevant because Sgt. Ackman was unaware of it. Opp. at 8; *see Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1232–33 (9th Cir. 2013) ("[W]e can only consider the circumstances of which [the officers] were aware when they employed deadly force.").

4

when he opened fire, but the footage shows that Mr. Garcia was closer.[6] *Id.* 143:18–144:4.

Mr. Garcia was transported to the hospital, where he underwent surgery and was placed on life support. Mr. Garcia died the following evening. *See* FAC ¶ 24; Dkt. No. 68-2, Ex. 13.[7]

### B. Procedural Posture

Plaintiffs, individually and as co-successors in interest, brought five claims under 42 U.S.C. § 1983 and California law against Defendants Napa County, Sgt. Ackman, and Does 1-10: (1) excessive force under the Fourth Amendment and loss of familial association under the First and Fourteenth Amendments; (2) municipal liability for the constitutional violations, otherwise known as a *Monell* claim; (3) violations of the California Bane Act, Cal. Civ. Code § 52.1; (4) negligence; and (5) assault and battery. *See* FAC ¶¶ 31–64.

Defendants filed a motion to dismiss, which the Court largely denied. *See* Dkt. No. 39. The Court dismissed only the *Monell* claim against Napa County, with leave to amend. *Id.* at 13. Plaintiffs did not file an amended complaint by the deadline. On October 4, 2022, Plaintiffs filed a motion for leave to amend the First Amended Complaint, seeking to reintroduce a *Monell* claim against the County of Napa. *See* Dkt. No. 57. Defendants opposed the motion to amend, Dkt. No. 60, and filed their motion for summary judgment soon after, Dkt. No. 61 ("Mot.").

## II. SUMMARY JUDGMENT

Defendants move for summary judgment on all causes of action. *See* Mot. at 2. The Court **GRANTS** Defendants' motion as to all federal claims and declines to exercise supplemental jurisdiction over the remaining state law claims.[8]

---

[6] Defendants contend Mr. Garcia was roughly 7.5 feet away. *See* Mot. at 7.

[7] Before engaging in the legal analysis that follows, it is important for the Court to acknowledge that this fatal shooting necessarily has had and will have tragic and traumatizing consequences for Mr. Garcia's loved ones, and no doubt for Sgt. Ackman as well. Whatever the outcome of this motion, the issues raised in this case deserve solemn and respectful consideration, and the Court has done its best to proceed accordingly.

[8] The parties raise various evidentiary objections. *See, e.g.*, Dkt. No. 75 at 15. The objections are **DENIED AS MOOT**. Because the body-worn camera and dashcam footage alone are determinative in the Court's qualified immunity analysis, the Court did not need to rely on the other evidence in question. For example, the parties submitted video enhancements, including an animated reconstruction and a frame-by-frame scrollable PDF, which the Court did not rely on. *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 706 (9th Cir. 2017) (noting the officer "watched events

**A. Legal Standard**

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at 325. In either case, the movant "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

---

unfold in real-time as the two videos played at their ordinary speed portray"). The Court does, however, cite to Defendants' synchronization of the body-worn camera and dashcam footage (in addition to the separate videos), as Plaintiffs did not object to this evidence. *See* Blechman Decl., Ex. J-3.

6

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S. at 323.

Because the record in this case includes video footage, the Court views the facts "in the light depicted by the videotape" while drawing all reasonable inferences in the light most favorable to Plaintiffs. *J. A. L. v. Santos*, 724 F. App'x 531, 532–33 (9th Cir. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).[9]

### B. Discussion

Defendants argue that Sgt. Ackman's conduct was objectively reasonable, and that in any event he is shielded from liability by the doctrine of qualified immunity. *See* Mot. at 13–21.

#### i. Fourth Amendment

In evaluating a Fourth Amendment claim of excessive force, courts ask whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citations omitted). "An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (en banc) (quotations omitted). Under *Graham*, courts consider factors such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* The immediacy of the threat posed by the suspect is the most important factor. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). The

---

[9] *Santos* and the other unpublished Ninth Circuit decisions cited in this order are not precedent, but may be considered for their persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

Ninth Circuit has recognized that an officer must give a warning before using deadly force "whenever practicable." *Gonzalez*, 747 F.3d at 794. Whether the officer had "alternative methods of capturing or subduing a suspect" is also relevant. *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc). In the end, these factors are not exclusive, and courts consider the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). Courts judge the reasonableness of a use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

The doctrine of qualified immunity protects government officials from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is supposed to give government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). In theory, the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation omitted). To determine if an officer is entitled to qualified immunity, the Court considers whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may choose which prong to address first. *Id.* at 236. Under either prong, though, the Court may not resolve genuine disputes of fact in favor of the party seeking summary judgment, and must, as in other cases, view the evidence in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

Under the second prong of the qualified immunity inquiry, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it.'" *City & Cnty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)). While this does not "require a case directly on point, [ ] existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id.* at 742. The Supreme Court has further instructed that, where "the

8

result depends very much on the facts of each case . . . officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Nicholson v. City of L.A.*, 935 F.3d 685, 695 (9th Cir. 2019) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)); *see also D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) ("[W]e have stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." (quotations omitted)). "Such specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1038 (9th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

Here, the second prong of the qualified immunity analysis is dispositive, so the Court exercises its discretion to address it first. *See Pearson*, 555 U.S. at 236–37; *Easley v. City of Riverside*, 890 F.3d 851, 856 (9th Cir. 2018), *on reh'g en banc*, 765 F. App'x 282 (9th Cir. 2019) ("If the second prong is dispositive, courts need not analyze the first.").

### a. Deadly Force

Plaintiffs contend that Sgt. Ackman's use of deadly force was contrary to established law set out in *Tennessee v. Garner*, 471 U.S. 1 (1985), and ten Ninth Circuit cases.[10] *See* Opp. at 19–20. Although the Court agrees with Plaintiffs that they do not need to identify a case directly on point, Plaintiffs' cases do not "squarely govern" the facts here such that any reasonable officer would have known "beyond debate" that deadly force was unconstitutional. Even construing the facts in the light most favorable to Plaintiffs—and putting aside allegations not captured by the videos—it is undisputed that Mr. Garcia advanced directly on Sgt. Ackman at close range while keeping his hand behind his back by his waistband, in defiance of commands to turn around and to stop. *See, e.g.*, BWC 0:30–1:01. Sgt. Ackman did not immediately resort to deadly force, but first retreated, repositioned, and yelled "stop" three times. *See id.* Plaintiffs' cases are not sufficiently

---

[10] Plaintiffs concede that the traffic stop itself was lawful because Mr. Garcia was driving with his headlights off. *See* Opp. at 2.

similar to this one to have put Sgt. Ackman on notice "beyond debate" that his conduct was unlawful.

First, many of Plaintiffs' cases are inapposite because they involve suspects who, taking the plaintiffs' version of the facts as true, were not advancing on an officer. Several of Plaintiffs' cases actually involved fleeing suspects. *See Garner*, 471 U.S. at 3–4 (suspect shot in the back of the head while fleeing over fence); *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (officers shot sixty-four-year-old using his walker with his gun trained on the ground); *Collender v. City of Brea*, 605 F. App'x 624, 628 (9th Cir. 2015) (suspect ran across the street away from officer who followed);[11] *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (officer shot suspect in the back in his home); *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) (officer was a sniper who shot retreating suspect); *Acosta v. City & Cnty. of S.F.*, 83 F.3d 1143, 1146–47 (9th Cir. 1996) (suspect advancing in a slow-moving vehicle); *Porter v. Osborn*, 546 F.3d 1131, 1134–36, (9th Cir. 2008) (suspect sitting in a vehicle); *A.D. v. State of Cal. Highway Patrol*, 712 F.3d 446, 458 (9th Cir. 2013) (same).

Plaintiffs' additional cases also do not meet the "clearly established" standard. In *A.K.H. v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016), an officer drove up to a suspect, commanded him to remove his hand from his pocket, then immediately shot him when he complied. Unlike here, the suspect was attempting to comply with the officer's order and was not advancing, and the officer had affirmative information that the suspect was not known to carry weapons. *See id.* at 1012–13. In *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018), officers shot a suspect who ran in their direction from the inside of a 7-Eleven. In holding that a reasonable jury could find the use of deadly force unlawful, the court reasoned that the officers had the suspect

---

[11] Even if *Collender* did squarely govern this case, it is unpublished and thus cannot provide "clearly established law" on its own. *See Wesby*, 138 S. Ct. at 589–90 (clearly established law must be dictated by controlling authority or a "robust consensus of cases of persuasive authority."); *Hines v. Youseff*, 914 F.3d 1218, 1230 (9th Cir. 2019) (citing CTA9 Rule 36-3 for the proposition that unpublished "memorandum dispositions do not establish law" and noting "it will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, we can conclude that the law was clearly established on the basis of unpublished decisions only.").

10

surrounded, had "established positions of cover" behind their cars, "outnumbered [the suspect] eight to one," and did not believe the suspect had a gun.[12] *Id.* at 1032 & n.7. Here, Sgt. Ackman was alone, with no backup or cover, and had been retreating in response to Mr. Garcia's advances. In *Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019), a suspect walked "at a relatively slow pace" toward an officer who stated he thought the suspect had a knife. There, under the plaintiffs' version of the facts, the officer pulled into a well-lit alley, got out of his car, gave no verbal commands, and shot a suspect holding nothing but a pen in his hand within seconds. *Id.* at 1141. Unlike *Nehad*, here the video footage leaves no room for doubt that Mr. Garcia advanced on Sgt. Ackman, then walked to the other side of the patrol car and again advanced quickly and directly at Sgt. Ackman, that Sgt. Ackman attempted to retreat and yelled "stop" three times before firing, and that Mr. Garcia's hand was not visible when Sgt. Ackman fired.

Moreover, binding precedent establishes that a furtive, harrowing, or threatening action from a person reasonably suspected of being armed may warrant deadly force. *See George*, 736 F.3d at 838; *see also N.E.M. v. City of Salinas*, 761 F. App'x 698, 700 (9th Cir. 2019) (citing *George* as creating "clearly established" law on this point). The Ninth Circuit in *George* wrote:

> This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.

736 F.3d at 838. In a case where the suspect had behaved erratically but was ultimately found to be unarmed, the Ninth Circuit wrote "it would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason." *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014).

The Court does not, by any means, interpret these cases as holding that any suspect who reaches toward their waistband or has a concealed hand, no matter the circumstances, has justified the use of deadly force. But here, given the undisputed facts established by the video footage, a

---

[12] The *Vos* court did, however, find that qualified immunity precluded individual liability. *See* 892 F.3d at 1034–36.

reasonable officer in Sgt. Ackman's position could have seen Mr. Garcia's behavior—advancing directly at close range, despite orders to stop and with a concealed hand where weapons are often kept—as the type of "harrowing" gesture that, under precedent, may justify the use of deadly force.

### b. Failure to Warn

Plaintiffs also argue that Sgt. Ackman failed to give Mr. Garcia a required deadly force warning. *See* Opp. at 17. They have filed supplemental authority, *Smith v. Agdeppa*, --- F. 4th ---, No. 20-56254, 2022 WL 17999612 (9th Cir. Dec. 30, 2022). *See* Dkt. No. 87. *Smith* emphasizes that it is clearly established in the Ninth Circuit that "the Fourth Amendment requires officers to warn before using deadly force when practicable." 2022 WL 17999612, at *2. The court there upheld a denial of qualified immunity, in part because the plaintiff "presented evidence calling into question whether [the officer] warned [] of his intent to use deadly force." *Id.* at *8. The officer claimed to have yelled "stop" before shooting, but that command was not audible in video footage. *Id.* at *9. The court found that since the officer said he had time to yell stop, a jury could conclude giving a warning was practicable. *Id.* at *8. The court further reasoned that "[b]ecause the officers had tased [the suspect] at least five times, a command to 'stop' would have done nothing to warn [him] that [the officer] was preparing to ramp up to use deadly force." *Id.*

*Smith* confirms that at the time of the shooting in this case, it was clearly established that officers must give deadly force warnings where practicable. *See id.* (citing *Gonzalez*, 747 F.3d at 794; *Harris*, 126 F.3d at 1201, 1204; and *Est. of Lopez v. Gelhaus*, 871 F.3d 998, 1011 (9th Cir. 2017) as clearly established law governing the shooting in that case on October 29, 2018). But it does not stand for the proposition that there was clearly established law as to what words an officer must say or what form a warning must take. *See id.* at *17 (Bress, J., dissenting). Nor does it hold that there was clearly established law that a command to stop is *always* insufficient. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. For example, the Supreme Court has rejected formulations of clearly established law such as "[an officer] may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm . . . ." *See Mullenix*, 577 U.S. at 12–13.

12

The correct inquiry is whether it was clearly established that the conduct was prohibited in the "situation [the officer] confronted." *Id.* at 13. And as *Gonzalez*, one of the cases relied on in *Smith*, noted, "[t]he absence of a warning does not necessarily mean that [an officer's] use of deadly force was unreasonable." *Gonzalez*, 747 F.3d at 797.

A reasonable officer in Sgt. Ackman's position could have believed that his actions were warning enough of impending deadly force. Sgt. Ackman can only be held liable if "any reasonable official in [his] shoes would have understood that he was violating" the constitution by not saying more than he did. *See Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff*, 572 U.S. at 778–79). In *Smith*, the court focused heavily on the fact that the officer had used his taser several times but did not warn the suspect that he was switching to his firearm and thus escalating to deadly force. *See* 2022 WL 17999612, at *2, 8. Here, Sgt. Ackman was pointing his firearm directly at Mr. Garcia at relatively close range almost continuously from the start. *See, e.g.*, BWC 0:15–0:20, 0:32–0:44, 0:50–0:58. It cannot be reasonably inferred that Mr. Garcia was unaware, at any point before the shooting, that Sgt. Ackman was pointing a gun at him. Despite this, and in defiance of commands to turn around, Mr. Garcia advanced directly on Sgt. Ackman. There is no dispute that Sgt. Ackman backpedaled and yelled "stop" three times, loudly and clearly, with escalating intensity, over about six seconds while keeping his gun trained on Mr. Garcia. *See id.* 0:52–0:57. His commands had no effect. The Court cannot presume to know why, and has no basis to speculate about what was in Mr. Garcia's mind. Regardless, in these circumstances, the open and obvious brandishing of a firearm combined with multiple verbal commands could lead a reasonable officer to conclude that Mr. Garcia had been sufficiently warned.

It is worth noting two more ways this case differs from *Smith*. First, as the *Smith* court wrote, the practicability of a deadly force warning "depends on whether the risk of danger was imminent." 2022 WL 17999612, at *7. There, the district court had "recognized that there was no danger [the suspect] was concealing a weapon because he was not wearing any clothing." *Id.* at *4. Here, a reasonable officer could have believed Mr. Garcia was about to access a concealed weapon in his waistband, which is what Sgt. Ackman testified he feared. *See, e.g.*, Ackman Dep. 136:21–137:9. Second, in *Smith,* as in many other cases denying qualified immunity, there were

13

numerous disputes of fact. There, the officers' body-worn cameras had fallen to the floor and the court found the officers' version of events to be "materially contradicted by the record." *Smith*, 2022 WL 17999612, at *2, 8. As the court noted, it was disputed whether the officer there yelled "stop" at all. *Id.* at *9. Thus, "the crux of the case turned on what the jury would decide about what happened in the moments before the shooting." *Id.* at *6. This case falls in a different category because video footage clearly shows what happened before shots were fired.

Given the undisputed facts, a reasonable officer in Sgt. Ackman's shoes could have believed that loudly commanding Mr. Garcia to stop several times at gunpoint, while retreating, was sufficient to notify Mr. Garcia that deadly force would be used if he kept advancing. *See Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) (reasoning that an advancing suspect "might never have passed the unannounced, pre-determined spot selected . . . had [the officer] given him a warning or a *command to halt*." (emphasis added)). This Court, like many others, has expressed reservations about the implications of the qualified immunity doctrine in practice.[13] But in applying it, as the Court must, it is hard to fathom that Sgt. Ackman's potential liability under these circumstances would turn on whether he said "stop, stop, stop" or "stop, stop," and something else. Denying qualified immunity on these facts simply would not offer the "breathing room" to make reasonable but mistaken judgments about legal questions that the doctrine envisions. *See al-Kidd*, 563 U.S. at 743.

In sum, even if Sgt. Ackman was mistaken and a jury could ultimately find that deadly force was unreasonable, there was no clearly established law that put the unlawfulness of his conduct at the time "beyond debate." Thus, summary judgment is **GRANTED** as to the Fourth Amendment claim.

//

//

---

[13] The qualified immunity standard routinely precludes federal juries of the parties' peers from evaluating the conduct of police officers, even where, as here, a shooting results in death. This rule thus negates the critical role of juries in assessing the reasonableness of lethal force applied in the community's name. *See Dew v. City of Seaside*, No. 19-CV-06009-HSG, 2021 WL 1749898, at *7 (N.D. Cal. May 4, 2021).

### ii. Loss of Familial Relationship

Defendants argue that qualified immunity also shields Sgt. Ackman from Plaintiffs' loss of familial association claim,[14] and that Sgt. Ackman did not act with the required "purpose to harm." Mot. at 20–22.

"Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter*, 546 F.3d at 1137 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* The parties agree the "purpose to harm" standard applies here. *See* Opp. at 21.

As with the excessive force claim, Sgt. Ackman is entitled to qualified immunity because there was no clearly established law that would have placed him on notice that his conduct violated the Fourteenth or First Amendments. Again, Plaintiffs have not identified any precedent that would make the right at issue "clearly established" at the time of Sgt. Ackman's alleged violation. *See Rivera v. Cater*, No. 218CV00056WBSEFB, 2019 WL 5102287, at *5 (E.D. Cal. Oct. 11, 2019) (finding defendants were entitled to qualified immunity because "[j]ust as there was no clearly established law to put the officers on notice that their conduct was violative of the Fourth Amendment, there was even less law to even suggest that their conduct violated the Fourteenth Amendment right to familial association"). Plaintiffs have not submitted evidence of

---

[14] Plaintiffs bring their familial association claim under both the First Amendment and the Due Process Clause of the Fourteenth Amendment. *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 458 (9th Cir. 2018) ("There are two distinct forms of freedom of association: (1) freedom of intimate association, protected under the Substantive Due Process Clause of the Fourteenth Amendment; and (2) freedom of expressive association, protected under the Freedom of Speech Clause of the First Amendment.").

an improper motive such as to "bully a suspect" or "get even." *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Plaintiffs cite to the last three shots fired as evidence of purpose to harm, arguing that Mr. Garcia was already falling to the ground by then. *See* Opp. at 22. But these shots were fired in a single volley over roughly two seconds and cannot reasonably be parsed in this way. *See Zion v. Cnty. of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) (finding officer did not act with purpose to harm in emptying his weapon because "[t]he two volleys came in rapid succession, without time for reflection"). There is nothing to suggest that Sgt. Ackman shot Mr. Garcia for a purpose other than his "perception of the need for self-defense," even if mistaken. *See Peck v. Montoya*, 51 F.4th 877, 894 (9th Cir. 2022).

The Court accordingly **GRANTS** summary judgment as to Plaintiffs' familial association claim.

### iii. State Law Claims

A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (internal quotations and citation omitted). Having granted summary judgment as to Plaintiffs' federal claims, the Court, in its discretion, declines to assert supplemental jurisdiction over the remaining state law claims. Accordingly, the Court **DISMISSES** Plaintiffs' remaining state law claims **WITHOUT PREJUDICE**.

### III. MOTION TO AMEND

Plaintiffs also move for leave to amend their First Amended Complaint. *See* Dkt. No. 57. Plaintiffs seek to reintroduce a *Monell* claim based on a theory that the County of Napa ratified Sgt. Ackman's conduct at a press conference and in an internal affairs investigative report concluding that he acted properly. *Id.* at 1–2. The Court **DENIES** the motion.

### A. Legal Standard

A plaintiff seeking to amend a complaint after the deadline in the court's scheduling order must first show "good cause" for modifying the schedule under Federal Rule of Civil Procedure 16(b). *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–09 (9th Cir. 1992). This is a "more stringent" standard than Rule 15, which normally governs the amendment of pleadings. *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 952 (9th Cir. 2006). A court may modify the schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (quoting *Johnson*, 975 F.2d at 609). If the party "was not diligent, the inquiry should end." *Id.*

### B. Discussion

Plaintiffs filed their motion well after the scheduling order's amendment deadline, so the "good cause" standard applies. The Court finds that Plaintiffs have not shown they were diligent based on the timeline in this case.

First, the litigation history itself is telling. Plaintiffs filed their case in May 2021. *See* Dkt. No. 1. The Court issued its order on the motion to dismiss on January 12, 2022, dismissing the *Monell* claim and granting Plaintiffs twenty-eight days to amend. Dkt. No. 39 at 13. Plaintiffs failed to do so. The deadline for amending pleadings per the scheduling order was not until March 7, 2022, but Plaintiffs still did not move to amend their complaint. *See* Dkt. No. 41. In August 2022, the Court granted two requests to amend the scheduling order to delay the close of fact and expert discovery. *See* Dkt. Nos. 49, 53. And now Plaintiffs seek to amend their complaint at an exceedingly late stage in this case. Plaintiffs filed their motion on October 4, 2022—two weeks before the summary judgment deadline, after the close of discovery and expert disclosures, and nearly eight months after the Court's grant of leave to amend expired. *See* Dkt. Nos. 53, 57.

Of course, if Plaintiffs had been unable to access the information underlying their amendments before this point, the late stage of litigation alone would not necessarily preclude a finding of diligence. But that is not the case here. Plaintiffs' proposed amendments are based on two events: a press conference at which Napa County Sheriff John Robertson stated he believed the shooting was within policy, and an internal investigation report signed by Undersheriff Cullen

Dodd that reached the same conclusion. *See* Dkt. No. 57-2 ¶¶ 38–39. The press conference occurred on October 15, 2020, before this case was even filed. *Id.* ¶ 38. Plaintiffs' counsel was undoubtedly aware of it: counsel conceded at the hearing that a partner at his firm was at the site of the press conference (though not "in the room") and spoke with the Sheriff afterward. As for the internal investigation report, Plaintiffs argue that Defendants did not produce it until June 8, 2022, after the deadline for amendments. Dkt. No. 57 at 2. However, Plaintiffs also bear some responsibility for that delay. Plaintiffs served the request for the report's production in August 2021 but did not follow up on the request until May 2022. *See* Dkt. No. 57-1 ("Hawkinson Decl.") ¶ 4. This was months after the Court's leave to amend the *Monell* claim expired and the scheduling order deadline passed. By January 12, 2022, when the Court granted the motion to dismiss with leave to amend, Plaintiffs' counsel was on notice of the need to pursue any information relevant to the *Monell* claim on a timeframe that would allow them to meet the Court's deadline. Based on these facts, there was significantly more that Plaintiffs' counsel could have done sooner to get the information they claim they needed.

Although a finding that Plaintiffs were not diligent ends the inquiry, *see Zivkovic*, 302 F.3d at 1087, the Court also notes that Plaintiffs' proposed amended complaint relies on many of the vague allegations of municipal policy that the Court found inadequate in its motion to dismiss order. *See* Dkt. No. 39 at 6–13. For example, Plaintiffs continue to allege "on information and belief" that Napa County ratified a policy "[t]o use or tolerate the use of unlawful deadly force," "cover-up violations of constitutional rights," and to "fail to have and enforce necessary, appropriate, and lawful polices . . . ." Dkt. No. 57-2 ¶ 40. This vagueness, well after the completion of discovery, further confirms that there is not good cause to amend the complaint mere months before the scheduled trial.

In sum, the Court finds that Plaintiffs have not shown good cause to change the scheduling order to allow for amendment of the complaint at this late stage.

//

//

//

**IV. CONCLUSION**

The Court **GRANTS** Defendants' motion for summary judgment and **DENIES** Plaintiffs' motion for leave to amend. The Court declines to exercise supplemental jurisdiction over the remaining state law claims and **DISMISSES** those claims **WITHOUT PREJUDICE** to Plaintiffs asserting them in state court. The Clerk is directed to enter judgment in Defendants' favor as to the federal claims in accordance with the above and to close the case.

**IT IS SO ORDERED.**

Dated: January 17, 2023

HAYWOOD S. GILLIAM, JR.
United States District Judge